UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
RALPH ROUSE, JR.,               )
                                )
          Plaintiff,            )
                                )
     v.                         ) Civil Action No. 06-2088 (RWR)
                                )
JOHN BERRY, et al.,             )
                                )
          Defendants.           )
_____)


<u>MEMORANDUM OPINION</u>

     Plaintiff Ralph Rouse, Jr. brings suit against the Director
of the Office of Personnel Management ("OPM"), and Long Term
Care Partners, LLC ("LTC Partners"), alleging that they engaged
in disability discrimination in violation of § 501 of the
Rehabilitation Act ("the Act"), 29 U.S.C. § 791, when Rouse was
denied standard coverage under the Federal Long Term Care
Insurance Program ("FLTCIP").[1]  The parties have filed cross-
motions for summary judgment.  No material facts are in dispute
and Rouse has failed to carry his burden to establish a triable
issue regarding whether the defendants discriminated against him
in a non-fringe-benefit aspect of his employment.  The

_____

     [1] Rouse's claim under § 504 of the Act, which prohibits a
federal agency or a federally funded program from denying
benefits to handicapped individuals solely on the basis of their
disability, was dismissed earlier.

defendants therefore are entitled to judgment as a matter of law.

BACKGROUND

The second amended complaint and the summary judgment filings set forth the following facts as to which there is no genuine dispute.  Plaintiff Rouse is an employee of the Department of Health and Human Services who applied for long term care insurance through the FLTCIP. (Second Am. Compl. ¶¶ 6, 13, 15.)  Rouse has paraplegia and uses a push wheelchair to assist with mobility.  (Id. ¶¶ 11-12.)  He revealed this use in his FLTCIP application.  (Id. ¶ 16.)  The application form stated that an affirmative response to the question of whether he used a medical device, aid, or treatment, such as a wheelchair, would make him ineligible "for any of the insurance options under this program shown in Part F of [the] form" (id.), which included standard coverage.  Rouse submitted his application and later received a letter from LTC Partners denying him standard coverage because of his wheelchair use. (Id. ¶¶ 15, 17; Fed. Def.'s Mot. Summ. J., Stmt. of Material Facts Not in Dispute ("Fed. Def.'s Stmt.") ¶ 49.)  LTC Partners offered Rouse its alternative coverage option instead.  (Fed. Def.'s Mot. Summ. J., Ex. C, Pl.'s Resp. to Req. for Adm'n 11; id., Ex. A ("Kichak Decl.") ¶¶ 20, 36-41.)

Rouse stated in his deposition that he has been treated fairly by the federal government with regard to the job opportunities for which he has applied and been hired over the course of his career. (LTC Partners' Mot. Summ. J. ("LTC Partners' Mot."), Ex. T ("Rouse Dep.") 24:16 to 25:1.) Rouse testified that, as far as he could recall, he has never been denied a promotion for which he applied (Rouse Dep. 76:5-13), and that he has received outstanding or exceptional work evaluations over the years of his employment (Rouse Dep. 77:12-21). He stated that he had never been denied healthcare, life insurance, or vacation hours because of his wheelchair use. (Rouse Dep. 77:22 to 78:19.) Rouse further acknowledged that he has never experienced discrimination in hiring, placement, promotions or other advancement opportunities in connection with or as a result of his being denied long term care insurance under the FLTCIP. (Rouse Dep. 82:3-9.) He nonetheless stated that his denial from standard coverage "caused [him] to really question why the federal government would have entered into something like [FLTCIP]," and that he "felt like it was a discriminatory offering." (Rouse Dep. 79:1-14.) Rouse stated that he feels that "people ought to be judged by their own -- the content of their character and the quality of their work and their abilities, rather than being put in a box." (Id.)

The FLTCIP is a long-term care insurance program sponsored by the federal government and administered by LTC Partners that provides benefits for long-term care, including home and community based services and services provided in nursing homes and other institutions.  OPM derives authority to establish and administer the FLTCIP from the Long-Term Care Security Act ("LTCSA"), 5 U.S.C. §§ 9001-9009.  The Act does not require the FLTCIP to provide universal coverage.  5 U.S.C. § 9002(e)(3) ("Nothing in this chapter shall be considered to require that long-term care insurance coverage be guaranteed to an eligible individual.").  Under the program, OPM enters into a "master contract" with a qualified insurance carrier that specifies the benefits, premiums and other terms and conditions of the policies issued by the carrier.  5 U.S.C. § 9003.  A federal employee must apply for coverage, and the carrier has discretion to accept or reject the application in accordance with the terms of the master contract.  5 U.S.C. § 9003(c); 5 C.F.R. § 875.407.

After LTCSA was enacted, OPM began the process of establishing a long-term care insurance program and developing underwriting standards for the program.  (Kichak Decl. ¶¶ 14-16.)  Nancy Kichak, Associate Director for Employee Services and Chief Human Capital Officer at OPM in 2000, when Congress enacted the LTCSA, said that OPM "relied on the industry experience in setting the guidelines OPM would use to manage the

risk pool of the FLTCIP," and that OPM used this information to determine how to solicit bids from providers.  (Kichak Decl. ¶ 15.)  OPM contracted with defendant LTC Partners, a joint venture between qualified carriers John Hancock Life Insurance Company and Metropolitan Life Insurance Company, in order to administer the FLTCIP.  (Fed. Def.'s Stmt. ¶ 14.)  LTC Partners ultimately determined the conditions for the risk class of individuals eligible for standard insurance coverage based on input from OPM and discussions with experts including underwriters and actuaries employed at John Hancock and MetLife.  (LTC Partners' Mot., Stmt. of Material Facts Not in Dispute ("LTC Partners' Stmt.") ¶ 22.)  Underwriting is the process of reviewing health and medical information provided during the insurance application process in order to determine whether an application presents a level of risk acceptable to the insurer.  (Id. ¶ 8.)  The FLTCIP incorporates three general risk classification categories: applicants eligible for standard coverage; applicants eligible for the alternate insurance coverage, and applicants not eligible for any insurance coverage.  (Id. ¶ 22.)  Wheelchair users were determined to be part of the risk class of individuals automatically ineligible for standard coverage.  (Id.)

DISCUSSION

Summary judgment may be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009). Here, where both parties move for summary judgment, the defendants are entitled to judgment in their favor if the plaintiff fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Section 501 of the Rehabilitation Act provides a cause of action for federal employees alleging disability discrimination. Taylor v. Small, 350 F.3d 1286, 1291 (D.C. Cir. 2003). The standards set forth in Title I of the Americans with Disabilities Act of 1990 ("ADA") apply when determining whether § 501 has been violated in a complaint alleging employment discrimination. See 29 U.S.C. § 791(g) (applying ADA standards to complaints alleging "nonaffirmative action employment discrimination"). Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter[.]" 42 U.S.C. § 12112(b)(2).

Although Title I of the ADA generally prohibits employment discrimination against disabled individuals, Congress created an exception to enable organizations to sponsor or provide bona fide benefit plans not subject to state insurance laws even if they offer different terms to disabled individuals, provided, however, that the benefits plan is not "used as a subterfuge to evade the purposes" of the ADA in preventing employment discrimination based on disability. 42 U.S.C. § 12201(c)(3). A plan is bona fide if it "exists and pays benefits." Pub. Employees Ret. Sys. of Ohio v. Betts, 492 U.S. 158, 166 (1989) (internal quotations omitted), superseded by statute, Older Workers Benefit Protection Act of 1990, Pub. L. No. 101-433, 104 Stat. 978. There is no dispute that FLTCIP is a bona fide benefit plan not subject to state laws that regulate insurance. (Pl.'s Opp'n at 5 n.4.) The parties dispute whether the FLTCIP is a subterfuge to evade the purposes of the ADA and therefore

whether the safe harbor provision shields the defendants from liability.

I.    STANDARD FOR SUBTERFUGE

The D.C. Circuit has resolved the interpretation of "subterfuge" that courts should employ to determine whether a plaintiff can maintain a discrimination claim against a bona fide benefit plan under the Rehabilitation Act.  In Modderno v. King, the Circuit accorded subterfuge its "'ordinary meaning as "a scheme, plan, stratagem, or artifice of evasion."'"  82 F.3d 1059, 1064 (D.C. Cir. 1996) (quoting Betts, 492 U.S. at 167 (quoting McMann, 434 U.S. at 203)).  The court adopted this definition from the Supreme Court's decision in Betts, 492 U.S. at 167, which interpreted a substantially similar exception found in the Age Discrimination in Employment Act of 1967 ("ADEA"), 81 Stat. 602, as amended, 29 U.S.C. § 621 et seq.  The D.C. Circuit considered both the statutory language and legislative history of the ADA to determine whether a different definition than that employed under the ADEA was warranted, but ultimately decided that Congress had intended the definition of "subterfuge" employed in Betts to apply.  The Modderno court reasoned that "Betts had been decided . . . before Congress adopted the 'subterfuge' language of § 501(c) of the ADA.  Thus when Congress chose the term 'subterfuge' for the insurance safe-harbor of the ADA, it was on full alert as to what the

Court understood the word to mean and possessed (obviously) a full grasp of the linguistic devices available to avoid that meaning." Modderno, 82 F.3d at 1065. It further was not persuaded to defer to the interpretation advanced by the EEOC -- that a disability-based distinction is invalid unless supported by a cost-based showing -- because that interpretation was found to be at odds with the plain language of statute. Id.

Proof of subterfuge requires a showing of discriminatory intent and "cannot mean merely a lack of actuarial justification." EEOC v. Aramark Corp., Inc., 208 F.3d 266, 271 (D.C. Cir. 2000). The D.C. Circuit and every other circuit to have considered the issue have rejected the contention that the ADA safe harbor provision applies only to plans with terms that are actuarially justified. See Modderno, 82 F.3d at 1065 (rejecting "actuarial defense interpretation of subterfuge" because it contradicts the plain language of the ADA); Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99, 105 (2d Cir. 1999) ("Neither the subterfuge clause nor the safe harbor provision to which it belongs makes reference to 'sound actuarial principles.'"); Ford v. Schering-Plough Corp., 145 F.3d 601, 611-12 (3d Cir. 1998); Parker v. Metro. Life Ins. Co., 121 F.3d 1006, 1012 n.5 (6th Cir. 1997); Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674, 678-79 (8th Cir. 1996)).

Proof of an actual intent to discriminate is an affirmative element of a plaintiff's cause of action.  In Betts, the Supreme Court reasoned that "[b]y requiring a showing of actual intent to discriminate in those aspects of the employment relationship protected by the provisions of the [Act], [the analogous ADEA safe harbor provision] redefines the elements of a plaintiff's prima facie case instead of establishing a defense to what otherwise would be a violation of the Act."  Betts, 492 U.S. at 181.  Accordingly, the employee "seek[ing] to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act . . . bears the burden of proving that the discriminatory plan provision actually was intended" to discriminate.  Id.  The D.C. Circuit has placed the burden on the plaintiff in suits brought under the ADA.  Aramark, 208 F.3d at 273.

Rouse argues in several ways that the subterfuge standard adopted in Modderno does not control this case, and he proposes that the definition of subterfuge advanced in EEOC regulations be used instead.  (Pl.'s Mem. at 17-26.)[2]  Indeed, Rouse

---

[2] The EEOC guidelines define subterfuge to mean disparate treatment in an employee benefit plan on the basis of disability "that is not justified by the risks or costs associated with the disability," including disparate treatment that is not "justified by legitimate actuarial data, or by actual or reasonably anticipated experience."  EEOC Interim Enforcement Guidance on the Application of the Americans with Disabilities Act of 1990 to Disability-Based Distinctions in Employer

dedicates most of his briefing to evaluating the defendants'
alleged discrimination under the standards promulgated by the
EEOC rather than under the case law of this circuit.  First,
Rouse argues that "Modderno is distinguishable from the instant
case because it dealt with limitations on benefits for a person
*already covered* by a plan rather than admittance to the
insurance plan itself."  (Pl.'s Mem. at 24 n.7 (emphasis in
original).)  Second, Rouse argues the case is distinguishable
because "Modderno was brought under § 504 of the Rehabilitation
[Act], whereas the instant case arises under § 501."  (Id.)
Third, Rouse argues that the definition endorsed in Modderno
does not control because the D.C. Circuit has not had an
opportunity to review an insurance plan that was established
*after* the enactment of the ADA.  (Pl.'s Opp'n at 15-16; Pl.'s
Reply at 16-17.)  However, the defendants respond, correctly,
that these factual distinctions are irrelevant to the holding in
Modderno and do not diminish the controlling status of the case.
(Fed. Def.'s Opp'n at 16.)  The same safe harbor provision
applies to actions under the Rehabilitation Act challenging
limitations of benefits for covered individuals as to actions
challenging denial of admittance into a given plan, and to
Rehabilitation Act cases under section 504, as well as under

---

Provided Health Insurance, 1993 WL 1497027, at *6 (EEOC
Guidance, June 8, 1993).

section 501.   The Modderno Court had to resolve the meaning of

the provision in order to decide the case before it, and the

statutory interpretation it adopted controls in future cases,

such as the instant case, where the definition of the provision

is at issue.

Similarly, although it is true that Modderno considered a

challenge to an insurance plan established before the enactment

of the ADA, this distinction bears only on the application of

the "subterfuge" definition to the facts of this case; it does

not permit lower courts to adopt a different definition

entirely.   In Modderno, the D.C. Circuit, relying on Supreme

Court decisions in McMann and Betts, found that because the

ordinary meaning of "subterfuge" requires an actual intent "to

evade" congressional purposes, a benefit plan established before

the ADA's passage could not constitute a subterfuge to evade the

ADA's purposes within the meaning of the safe harbor provision.

Modderno, 82 F.3d at 1064 (noting the Supreme Court's

observation that "[t]o spell out an intent in 1941 to evade a

statutory requirement not enacted until 1967 attributes, at the

very least, a remarkable prescience to the employer") (quoting

McMann, 434 U.S. at 203)).   Here, the FLTCIP was established

after the ADA's passage.   The rule that intent to evade is

extremely difficult or even impossible to establish with respect

to a plan adopted before the relevant statute was enacted does

not apply.  Defendants concede that it is theoretically possible that the FLTCIP was established to evade the purposes of the Rehabilitation Act  (LTC Partners' Reply at 9), but Rouse must establish that the plan was a subterfuge by reference to the definition endorsed in Modderno.  Irrespective of the particular facts of the Modderno case, the court's "interpretation of the safe harbor was essential to its reasoning as well as to its disposition of the claims before it," and the subterfuge definition therefore "stands as binding precedent."  Aramark, 208 F.3d at 272.

Rouse criticizes the reasoning of Modderno, contending that the D.C. Circuit, "[i]n applying Betts to ADA cases . . . did not take the legislative history into account" (Pl.'s Reply at 3), and repeatedly invites this court essentially to overrule the decision (Pl.'s Mem. at 24 n.7 (stating that "[t]o the extent the Court considers Modderno applicable, the Court should take the opportunity to reconsider its application under these circumstances"); Pl.'s Reply at 3 (stating that because the D.C. Circuit did not take legislative history into account, "the Court in this case should take this opportunity to grant deference to the EEOC's interpretation of the ADA")).  The decisions of the D.C. Circuit, including Modderno, are binding on the lower courts of this circuit "unless and until overturned by the court en banc or by Higher Authority."  Critical Mass

Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 876
(D.C. Cir. 1992) (en banc) (citation omitted); see also Lee v.
United States, 570 F. Supp. 2d 142, 149 (D.D.C. 2008) ("The
doctrine of *stare decisis* compels district courts to adhere to a
decision of the Court of Appeals of their Circuit until such
time as the Court of Appeals or the Supreme Court of the United
States sees fit to overrule the decision.") (quoting Owens-Ill.,
Inc. v. Aetna Cas. & Sur. Co., 597 F. Supp. 1515, 1520 (D.D.C.
1984)).  To the extent that Rouse wishes to reargue the
relevance of the legislative history of the ADA and the agency
deference due to the EEOC, he must direct those arguments to the
appeals court sitting en banc.  Rouse's present reliance on the
EEOC standards therefore is misplaced.

Finally, Rouse relies on case law interpreting the safe
harbor provision applicable to insurers and other organizations
that underwrite, classify, or administer risks according to
state law, 42 U.S.C. § 12201(c)(1), as opposed to the provision
applicable to bona fide benefit plans, such as FLTCIP, that are
not subject to state laws that regulate insurance, 42 U.S.C.
§ 12201(c)(3).  The relevant ADA provisions are as follows:

(c)  Insurance.  Subchapters I through III of this chapter and
title IV of this Act shall not be construed to prohibit or
restrict -- . . .

   (1) an insurer, hospital or medical service company, health
   maintenance organization, or any agent, or entity that
   administers benefit plans, or similar organizations from

> *underwriting risks, classifying risks, or administering*
> *such risks that are based on or not inconsistent with State*
> *law; or . . .*
>
> (3) a person or organization covered by this Act from
> establishing, sponsoring, observing or administering the
> terms of a bona fide benefit plan that is not subject to
> State laws that regulate insurance.

42 U.S.C. § 12201(c) (emphasis added).  These two subsections

are subject to the identical restriction that they "shall not be

used as a subterfuge to evade the purposes of subchapter[s] I

and III of this chapter."  Id.  However, although subsection

(c)(1) expressly limits the exemption to insurers and others who

underwrite, classify, or administer risks based on or not

inconsistent with state law, subsection (c)(3) makes no mention

of underwriting or otherwise assessing risks.  Rouse cites

Doukas v. Metropolitan Life Ins. Co., 950 F. Supp. 422, 424

(D.N.H. 1996).  (Pl.'s Combined Opp'n at 17.)  There, a district

court considered an action by a plaintiff to recover under the

ADA against a mortgage disability insurer who denied her

application for insurance because the plaintiff's medical

history, which included bipolar disorder, "did not meet its

underwriting standards governing disability coverage."  Although

the district court found genuine issues of fact existed as to

whether the insurer's decision was "related to actual or

reasonably anticipated experience," Doukas, 950 F. Supp. at 432,

its decision addressed the safe harbor provision in subsection

(c)(1), not subsection (c)(3).  The court's holding that "it appear[ed] that an insurance company's failure to rely on actuarial principles or actual or reasonably anticipated experience *may be inconsistent with New Hampshire law*," id. at 428 (emphasis added), does not support Rouse's proposal to require actuarial justification in this case.

## II.  FRINGE-BENEFIT VS. NON-FRINGE-BENEFIT ASPECTS OF EMPLOYMENT RELATIONSHIP

A benefits plan is a subterfuge "to evade the purposes" of the ADA, 42 U.S.C. § 12201(c), where there is actual intent to use the terms of the benefit plan as a means of discriminating against a disabled individual in protected aspects of employment.  Applying its definition of subterfuge, Betts concluded that "the provisions of a bona fide benefit plan [were exempt] from the purview of the ADEA so long as the plan [was] not a method of discriminating in other, *non-fringe-benefit aspects* of the employment relationship[.]"[3]  Betts, 492 U.S. at 177 (emphasis added).  Rouse maintains that Betts's requirement is limited to suits under the ADEA, and that here, where suit is brought under the Rehabilitation Act and the ADA safe harbor provision applies, a benefit plan is exempt only if it does not

---

[3] Fringe benefits have been defined to include "'medical, hospital, accident, life insurance and retirement benefits; profit-sharing and bonus plans; leave; and other terms, conditions, and privileges of employment.'"  Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674, 679 n.6 (8th Cir. 1996) (quoting 29 C.F.R. § 1604.9).

discriminate in either fringe-benefit or non-fringe-benefit aspects of employment. (Pl.'s Opp'n at 21-22.) Betts concluded that a bona fide benefit plan is entitled to rely on the safe harbor provision unless it discriminates in non-fringe-benefit aspects of employment in order to give meaningful effect to both the ADEA's general prohibition of age-based discrimination and the safe harbor provision. The general prohibition provided that "it is unlawful for an employer 'to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[,]'" Betts, 492 U.S. at 165 (quoting § 4(a)(1) of the ADEA), while the safe harbor provision exempted bona fide benefit plans in a manner nearly identical to the analogous provision in the ADA. The Court reasoned that interpreting the safe harbor provision to permit liability where a plan discriminated in fringe-benefit aspects of employment "would in effect render [the safe harbor provision] nugatory" since "[a]ny benefit plan that by its terms mandated discrimination against older workers would also be facially irreconcilable with the prohibitions in § 4(a)(1) and, therefore, with the purposes of the Act itself." Betts, 492 U.S. at 177.

    The same holds true in the present context. Concluding that FLTCIP is ineligible for the safe harbor provision because

it makes disability-based distinctions in a "fringe-benefit
aspect" of employment would place the very purpose of an
explicit exemption for bona fide benefit plans in serious doubt.
Rouse argues that such a conclusion is justified by the ADA's
definition of the term "discrimination," which includes
participating in "a relationship with . . . an organization
providing fringe benefits to an employee of the covered entity,"
where the relationship "has the effect of subjecting a covered
entity's qualified applicant or employee with a disability to
the discrimination prohibited by this subchapter."  42 U.S.C.
§ 12112(b)(2) (emphasis added).  According to Rouse, this
definition proves that the purpose of the ADA includes avoiding
discrimination in both the provision of fringe benefits and in
other aspects of employment.  (Pl.'s Reply at 20-21.)  He
further cites an Eleventh Circuit opinion, Johnson v. K Mart
Corp., 273 F.3d 1035, 1050-51 (11th Cir. 2001), vacated pending
reh'g en banc, 273 F.3d 1035, 1070 (11th Cir. 2001) (decision
suspended as a result of the automatic stay imposed by the
defendant's bankruptcy petition), that agrees with his
reasoning, concluding that "§ 12112(b) -- which includes in the
definition of discrimination a wide array of actions that
'adversely affect[ ] the opportunities or status of [job
applicants or employees] because of . . . disability' -- not
only reinforces a broad reading of the rule against disability-

based discrimination but specifically prohibits discrimination in fringe benefits."

Rouse's argument misreads the language of § 12112(b)(2). By its terms, subsection (b)(2) describes situations in which a covered entity may be held liable under the ADA for discrimination carried out not by the entity itself but by the entity's contractual or other partners, including the entity's fringe benefit plans. However, the provision does not purport to alter or expand the substance of the "discrimination prohibited by this subchapter," 42 U.S.C. § 12112(b)(2), which is explicitly set forth in the previous section, § 12112(a). Subsection (a) prohibits disability-based discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Although "terms, conditions, and privileges of employment" could be construed to include bona fide fringe benefit plans, the explicitly more specific reference to those plans in the safe harbor provision takes them out of the general prohibition, as the Supreme Court recognized in Betts when interpreting ADEA language that was identical in relevant part. Betts, 492 U.S. at 165 (noting that "[n]otwithstanding th[e] general prohibition" against age-based discrimination "with respect to . . . terms, conditions, or privileges of employment"

the safe harbor provision made specific exceptions for bona fide employee benefit plans).  In sum, the rule in Betts, requiring a plaintiff to show discrimination in non-fringe-benefit aspects of employment, is warranted here.  There is no language in the ADA compelling a different result and adopting Rouse's proposed position would render the safe harbor provision meaningless.

III. FLTCIP'S ELIGIBILITY FOR SAFE HARBOR PROVISION

In view of the standards outlined above, defendants' entitlement to summary judgment turns on whether Rouse has created a triable issue that the FLTCIP was a means of discriminating against him in non-fringe-benefit aspects of his employment.  The Supreme Court stated in the ADEA context that examples of discrimination in a non-fringe benefit aspect of employment might include an employer reducing salaries for all employees "while substantially increasing benefits for younger workers[,]" or an employer "adopt[ing] a plan provision formulated to retaliate against" an employee who filed a discrimination complaint.  Betts, 492 U.S. at 180.  Rouse, however, stated in his deposition that he had been treated fairly by the federal government with regard to the employment opportunities for which he has applied and been hired over the course of his career (Rouse Dep. 24:16 to 25:1), and that he has never experienced discrimination in hiring, placement, promotions or other advancement opportunities in connection with

or as a result of his being denied standard long term care insurance under the FLTCIP (Rouse Dep. 82:3-9). Rouse contends that FLTCIP is a subterfuge to evade the purposes of the ADA even under the Betts standard because a goal of FLTCIP is to "attract and retain employees," which he characterizes as a non-fringe benefit aspect of the employment relationship, and the automatic exclusion of wheelchair users from standard coverage discourages them from seeking or maintaining federal employment. (Pl.'s Opp'n at 22.)

Employing the definition of "subterfuge" endorsed by the D.C. Circuit, Rouse must show that defendants designed FLTCIP as "a scheme, plan, stratagem, or artifice of evasion," Modderno, 82 F.3d at 1064 (internal quotations omitted), to discourage wheelchair users from seeking or maintaining federal employment. Rouse has not proffered evidence tending to prove such actual intent. Rouse, moreover, is a long-time federal employee who does not contend that he was discouraged from seeking or maintaining government employment. See, e.g., Aramark, 208 F.3d at 272 ("Neither appellant explains how the plan amendments could be a subterfuge to evade the ADA and discriminate against [appellant] if they did not affect her."). Although Rouse proffered evidence that the federal government has witnessed a declining number of disabled employees since 2000, the

conclusion that implementation of FLTCIP caused or was intended to cause such decline is entirely speculative.

Rouse also argues that the automatic exclusion of wheelchair users from standard coverage stigmatizes disabled federal employees and insulted his own personal worth.  (Pl.'s Opp'n at 22-23.)  Although such effects might arguably be characterized as products of prohibited discrimination in regard to "other conditions" of employment, 42 U.S.C. § 12112(a), stigma and insult arising from exclusion from standard coverage are inherently connected to the terms and conditions of the fringe benefit itself, rather than the terms and conditions of Rouse's employment.  Such effects therefore are not properly considered to relate to non-fringe-benefit aspects of employment.

## CONCLUSION

No material facts are in dispute and Rouse has not produced evidence tending to show that defendants discriminated against him in a non-fringe-benefit aspect of employment.  Summary judgment therefore will be entered in favor of the defendants. An appropriate order accompanies this memorandum opinion.

SIGNED this 24th day of March, 2012.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge